UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TAREK EL-GHAZALY, M.D.,

                            Plaintiff,

      -against-

JASON KIM, M.D., WAYNE WALTZER, M.D.,
JOHN FITZGERALD, M.D., MS. LORA
DEMPSEY, and ZHENYUE HUANG, M.D.,

                          Defendants.
-----------------------------------------------------------------X

**COMPLAINT**

Civil Case No.:
**25-cv-03939**

**JURY TRIAL
DEMANDED**

Plaintiff Tarek El-Ghazaly, M.D., ("Plaintiff" or "Dr. El-Ghazaly"), as and for his Complaint against Defendants Dr. Jason Kim, Dr. Wayne Waltzer, Dr. John Fitzgerald, Ms. Lora Dempsey, and Dr. Zhenyue Huang (collectively, "Defendants"), alleges as follows:

**PRELIMINARY STATEMENT**

1.     This case is about a medical institution that abandoned its sacred duty to protect human life and instead cultivated a culture of hubris, bigotry, and retribution. At Stony Brook University Hospital ("SBUH" or the "Hospital"), physicians sworn to do no harm weaponized their authority to humiliate, silence and ultimately expel a young Egyptian doctor who dared to speak the truth.

2.     Dr. Tarek El-Ghazaly was not only a highly competent and dedicated resident—he was a whistleblower who risked his career to protect patients from negligent care, unqualified supervision, and racially charged abuse masquerading as medical leadership.

3.     Rather than address the dangerous misconduct he exposed, SBUH's leadership doubled down on retaliation. At the heart of this case lies a disturbing truth: the very individuals entrusted with training the next generation of doctors—Defendants Jason Kim, M.D., Wayne

Waltzer, M.D., and John Fitzgerald, M.D. — brazenly violated the Hippocratic Oath. They permitted, perpetuated, and participated in a system where racism was tolerated, medical incompetence was concealed, and physical assault in the operating room went unpunished.

4.      Dr. El-Ghazaly's courage in documenting patient safety risks, exposing hate speech from his supervisors, and reporting violent misconduct should have earned him praise. Instead, it made him a target. SBUH and its senior physicians, including Defendants herein, responded not with reform, but with calculated lies, gaslighting, and, ultimately, termination—all to protect their reputations and silence dissent.

5.      This lawsuit seeks to hold Defendants accountable for the institutional cowardice and moral decay that permanently and irreparably destroyed Dr. El-Ghazaly's medical career.

## JURY TRIAL DEMANDED

6.      Plaintiff demands a jury trial on all claims alleged herein.

## PARTIES

7.      Plaintiff, Dr. Tarek El-Ghazaly, an Egyptian doctor, is a citizen of Egypt and Canada, and a resident of Qatar.

8.      At all times relevant hereto, Plaintiff was employed by SBUH.

9.      Defendant Jason Kim, M.D. ("Dr. Kim" or "Defendant Kim"), is a resident of the State of New York.

10.      At all times relevant hereto, Dr. Kim was employed by SBUH as the Urology Program Director and had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

11.      Defendant Wayne Waltzer, M.D., ("Dr. Waltzer" or "Defendant Waltzer") is a resident of the State of New York.

2

12.    At all times relevant hereto, Dr. Waltzer was employed by SBUH as the Chairman of the Department of Urology and had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

13.    Defendant John Fitzgerald, M.D., ("Dr. Fitzgerald" or "Defendant Fitzgerald") is a resident of the State of New York.

14.    At all times relevant hereto, Dr. Fitzgerald was employed by SBUH as a Urology Attending Physician and had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

15.    Defendant Ms. Lora Dempsey ("Ms. Dempsey" or "Defendant Dempsey") is a resident of the State of New York.

16.    At all times relevant hereto, Ms. Dempsey was employed by SBUH as a Urology Program Coordinator, working under Dr. Kim, and had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

17.    Defendant Zhenyue Huang, M.D. ("Dr. Huang" or "Defendant Huang") is a resident of the State of New York.

18.    At all times relevant hereto, Defendant Huang was employed by SBUH as a Urology Clinical Fellow, working under Dr. Kim, and had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

## JURISDICTION AND VENUE

19.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because Plaintiff has brought federal claims, including claims for discrimination under 42 U.S.C. § 1981.

20.     This Court also has diversity jurisdiction pursuant to 18 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum of $75,000 and is between citizens of different states.

21.     The Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Dr. Jason Kim because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

23.     This Court has personal jurisdiction over Dr. Wayne Waltzer because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

24.     This Court has personal jurisdiction over Dr. John Fitzgerald because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

25.     This Court has personal jurisdiction over Ms. Lora Dempsey because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

26.    This Court has personal jurisdiction over Dr. Zhenyue Huang because Defendant has violated Plaintiff's rights in this district and a substantial part of the events that gave rise to this Complaint occurred in this district.

27.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as one or more Defendants reside within the Eastern District of New York or the acts complained of occurred therein.

## FACTUAL ALLEGATIONS

### *Background and Hiring*

28.    Dr. Tarek El-Ghazaly is a highly talented and dedicated Egyptian physician who earned his medical degree and was in the process of completing rigorous, advanced training in urology in the United States.

29.    On November 1, 2022, Dr. El-Ghazaly was recruited and hired by Stony Brook University Hospital as an off-cycle PGY2 Urology resident, having left a prestigious clinical robotic and laparoscopic surgery fellowship position at Northwestern University in Chicago to join the former.

30.    From day one, Dr. El-Ghazaly was placed under the authority of Defendants Dr. Jason Kim, who was the Program Director, Dr. Wayne Waltzer, who was the Department Chair, and Dr. John Fitzgerald,  who was the Attending Physician—all of whom exercised direct and unfettered control over Plaintiff's daily duties, performance evaluations, work assignments, training and ultimately his future in the program.

31.    These same Defendants also wielded authority over pay, personnel records, and critical decisions about retention, discipline, and termination.

32.     At all relevant times, SBUH employed fifteen or more individuals for twenty or more weeks in the calendar year.

33.     Dr. El-Ghazaly was indisputably qualified and consistently performed above expectations, as evidenced by glowing feedback from multiple attending physicians.

### *Racism, Dehumanization, and a Culture of Intolerance*

34.     From the outset, Dr. El-Ghazaly was subjected to a relentless pattern of racist, degrading, and dehumanizing comments and treatment.

35.     In March 2023, during his rotation at the Northport VA Medical Center, Dr. Fitzgerald, while seeing patients in the clinic, sneered at him and said, "Tarek, are you Egyptian? Did you know that Egyptians would inter-breed?"—a revolting comment that reduced Dr. El-Ghazaly's identity to a racist trope.

36.     Unfortunately, this was not an isolated remark. Over the following six months, Dr. Fitzgerald made his bias known by repeatedly spewing racist and xenophobic remarks, targeting Dr. El-Ghazaly and other minorities with open contempt. On October 6th, 2023, while performing a urethral dilation, Dr. Fitzgerald told Dr. El-Ghazaly, "In Egypt, they don't use numbing gel. They believe the patient should be punished for having a problem."

### *Installing an Unqualified Ally: Dr. Fierro*

37.     Early in his tenure, Dr. El-Ghazaly witnessed Dr. Fitzgerald provide substandard care to his patients. Among other things, Plaintiff observed Dr. Fitzgerald struggling while performing robotic prostatectomies, which had the potential to cause severe morbidity to patients with long term loss of urinary incontinence, as well as unnecessarily prolonging the surgery and raising the risk of cardiovascular compromise. Plaintiff also observed Defendant Fitzgerald failing to dissect and ligate the vas deferens on both sides for a Haitian-American patient undergoing a

vasectomy, a basic urological procedure. Dr. El-Ghazaly later heard Dr. Fitzgerald make disparaging remarks about Haitian-American patients undergoing certain urological treatment interventions.

38.    Dr. El-Ghazaly, new to his role, initially refrained from voicing his concerns and simply tried to assist Dr. Fitzgerald to the best of his capability.

39.    Very quickly, despite Dr. Fitzgerald's personal bias towards Dr. El-Ghazaly, he could not deny Dr. El-Ghazaly's professional experience and capabilities.

40.    Consequently, in or around March 2023, Dr. Fitzgerald directed Dr. El-Ghazaly to train under the supervision of Allegra Fierro, M.D. ("Dr. Fierro").

41.    Dr. Fitzgerald had strongly advocated the hiring of Dr. Fierro as an attending to supervise urology residents, despite the fact she had no training in urology.

42.    Despite her glaring lack of credentials, Dr. Fitzgerald permitted Dr. Fierro to falsely present to colleagues and trusting patients as a urology attending – although she had in fact only been hired as a hospitalist – which provided her the unearned authority to supervise residents, sign patient notes, and undertake procedures for which she had absolutely no training.

43.    Dr. Fierro also scheduled surgical cases for Dr. Fitzgerald, without the clinical knowledge to select appropriate procedures, placing unsuspecting patients at extreme risk.

*__Plaintiff Risks His Promising Career to Protect Lives__*

44.    In the first few months of his fellowship the incompetencies Dr. El-Ghazaly witnessed between Dr. Fitzgerald and his protégé Dr. Fierro, and their resistance to constructive feedback, became a growing concern.

45.    By way of example, after a bungled prostatectomy, Dr. Fitzgerald sought feedback from Dr. El-Ghazaly and asked for his thoughts via text. Dr. El-Ghazaly, in response, provided

respectful, constructive clinical observations detailed in **Exhibit A**. The next day, Dr. Fitzgerald berated him, declaring that his age and experience were a "problem" and warning him that he needed to "know his place."

46.    Dr. El-Ghazaly verbally voiced his concerns regarding Dr. Fitzgerald's highly flawed technique using robotic prostatectomies to PGY5 chief residents Dr. Tal Cohen ("Dr. Cohen"), who told him to "remain silent" and Dr. Annie Chen ("Dr. Chen"), who told him "Tarek this is not the program where you express your concerns."

47.    Although terrified of the impact speaking out would have on his medical career, the malpractice Dr. El-Ghazaly witnessed soon became too concerning to just remain silent.

48.    In April 2023, one of Fritzgerald's patients suffered a postoperative myocardial infarction. Dr. Fitzgerald placed Dr. Fierro in charge of the patient's post-operative care. Dr. Fierro's negligently failed to prescribe essential blood pressure medication, which caused the patient's systolic blood pressure to escalate to a dangerous level of 200mmHg, which worsened the patient's myocardial infarction postoperatively.

49.    Dr. El-Ghazaly witnessed Dr. Fierro's undeniable malpractice.

50.    Worse, Dr. El-Ghazaly witnessed multiple other instances of Dr. Fierro's rank incompetence harming patients, including but not limited to: (i) scheduling an inappropriate and unnecessary procedure for a patient deemed too sick by a tumor board to even undergo chemotherapy, much less surgery; (ii) failing to identify signs of an impending septic shock in another patient; and (iii) independently performing a procedure on a patient without the requisite training, which led to multiple re-admissions by the patient which could have been entirely avoided.

51.      Unable to idly stand by and watch the danger Dr. Fierro imposed upon trusting patients, and bound by his Hippocratic oath to "Do No Harm," Dr. El-Ghazaly reported Dr. Fierro's incidents of malpractice to his chief residents. To ensure that immediate corrective action would be taken to protect unsuspecting patients from Dr. Fierro's dangerous incompetence, he submitted a letter on March 22, 2023, "Litigation Risk to VA Residents," outlining egregious patterns of medical misconduct by Dr. Fierro. See **Exhibit B**.

52.      Dr. El-Ghazaly's complaints were further corroborated when the internal medicine department complained about Dr. Fierro's management of a patient. And like clockwork, Dr. Fitzgerald came to her defense, shamelessly maintaining the lie that she was a qualified urology attending, and as such, she "needs to be obeyed."

53.      By August of 2023. Dr. Fierro's track record of incompetence was too well documented, largely due to Dr. El-Ghazaly courageously speaking out and submitting written complaints, so that even Dr. Fitzgerald could no longer protect her.

54.      In August of 2023. Dr. Fierro resigned.

### *Dr. Fitzgerald Retaliates by Physically Assaulting Dr. El-Ghazaly in the Operating Room*

55.      Shortly after Dr. Fierro's resignation, Dr. Fitzgerald engaged in shocking behavior that revealed his extreme animus towards Plaintiff after he had exposed Dr. Fierro's incompetence and forced her exit from SBUH.

56.      Dr. Fitzgerald informed Dr. El-Ghazaly that he knew he had a meeting with Dr. Kim following the complaint about Dr. Fierro. He then threatened: ***"You understand that whatever I tell Jason at the end of your rotation will determine your future…"***

57.      Dr. Fitzgerald also stated, "I think your age and experience have been a problem." "You should be demoted."

58.    Thereafter, Dr. Fitzgerald would repeat his offensive comments about Egyptians as "inbreds." He also made derogatory comments about African-Americans and Haitian-Americans saying they "wouldn't respond to interventions" because they were "predisposed to prostate cancer," and he mocked Jews during clinic hours, showing videos ridiculing a Jewish man in a video flinging a chicken over his head in connection with Yom Kippur while quipping, "Do you ever see yourself doing anything like that?"

59.    On September 29, 2023, while Dr. Fitzgerald and Dr. El-Ghazaly were in the operating room performing a hydrocelectomy, Dr. Fitzgerald physically assaulted Dr. El-Ghazaly.

60.    During the end of a scrotal hydrocelectomy, which involves making a small incision in the patient's scrotum, Dr. El-Ghazaly was suturing the edges of the hydrocele sac, when Dr. Fitzgerald told him he wasn't holding the needle holder the way he wanted it held. Dr. Fitzgerald then used the sharp-toothed, bloodied Adson Forceps that the two doctors had been using throughout the surgery to grab Dr. El-Ghazaly's finger, pinching it hard multiple times, while twisting, cutting through Dr. El-Ghazaly's gloves.

61.    Shockingly, as Dr. El-Ghazaly cried out in pain, Dr. Fitzgerald admitted he did it intentionally, to "teach him a lesson," smugly bragging to the medical student witness that another attending had been fired for the same behavior. Then Dr. Fitzgerald, sadistically and recklessly, repeated the attack several more times, which foreseeably penetrated Dr. El-Ghazaly's gloves resulting in bruising to his finger.

62.    Dr. Fitzgerald's retaliatory assault created a risk to the patient by continuing to use a contaminated instrument during surgery, as well as to Dr. El-Ghazaly since the patient had not been tested for HIV or Hepatitis prior to the surgery.

63.     Joanne Kim, a medical student, witnessed this assault in real time and corroborated

Dr. El-Ghazaly's report. See **Exhibit C**.

***The Hospital Ignores Dr. Fitzgerald's Pattern of Medical Incompetence, as well as his
Discriminatory and Retaliatory Conduct.***

64.     Immediately following the assault, during the very next surgery, Dr. Fitzgerald told

Dr. El-Ghazaly, "Arabs don't shower," and "we should have bombed them after 9/11."

65.     These horrific, dehumanizing remarks were made in the middle of a surgical

procedure—degrading, racist, and utterly unprofessional.

66.     Dr. El-Ghazaly reported both the physical assault and hate speech to the Stony

Brook Office of Equity ("Equity Office").

67.     After a thorough investigation, the Equity Office fully substantiated his complaint.

See **Exhibit D**.

68.     Despite the findings of the Equity Office, the Hospital took no meaningful

corrective action against Dr. Fitzgerald.

69.     Dr. El-Ghazaly also reported his concerns regarding Dr. Fitzgerald's manifest

incompetence in the operating room. For example, Dr. Fitzgerald struggled while performing

robotic prostatectomies, which had the potential to cause severe morbidity to patients with long-

term loss of urinary continence, as well as to prolong the surgery and raise the risks of

cardiovascular compromise. Dr. El-Ghazaly also reported during another procedure Dr.

Fitzgerald's failure to dissect the vas deferens on both sides for a patient undergoing a vasectomy.

70.     Much like his report of discrimination, the Hospital took no action whatsoever

against Dr. Fitzgerald.  The Hospital's culture of protecting their own overrode the blatant risk of

danger Dr. Fitzgerald posed to patients.

71.    The environment Dr. Fitzgerald created in the operating room emboldened others to join in on the discriminatory verbal abuse. For example, after the same case during which Dr. Fitzgerald made the latter comments, the attending Anesthesiologist, Dr. Caballero, asked Dr. El-Ghazaly in the Post Anesthesia Care Unit, "so did you train with Dr. Ayman Al-Zawahri (Bin Laden's number two)? You know he was a doctor, right?"[1] Dr. Caballero then burst into laughter.

72.    Other residents who had previously been mistreated by Dr. Fitzgerald continued to face abuse from physicians within his circle, further contributing to a hostile work environment for trainees.

73.    Moreover, Dr. Fitzgerald continued to mismanage minority patients even after the complaint.  For example, on February 9, 2024, a Jewish patient presented to the emergency room with a documented intra-peritoneal bladder rupture resulting from a negligent procedure performed by Dr. Fitzgerald. Despite clear medical guidelines, which necessitated immediate surgical intervention to repair the damage, Dr. Fitzgerald inappropriately discharged the patient home, leading to a worsening condition that progressed into full-blown peritonitis and ileus. The patient was later readmitted and required multiple additional procedures and a prolonged hospitalization as a result of Dr. Fitzgerald's mismanagement.

### Dr. Kim Enables Dr. Fitzgerald's Grossly Improper Conduct

74.    On October 27, 2023, Dr. El-Ghazaly assisted Dr. Tal Cohen with a six-hour radical cystectomy and ileal conduit surgery. After the surgery, Dr. Cohen gave Dr. El-Ghazaly purely positive feedback, told him he did a great job, and told him that he delivered the same feedback to Dr. Kim. Dr. Cohen noted the way Dr. Fitzgerald was treating Dr. El-Ghazaly and asked Dr. El-Ghazaly, "Why is he being such an asshole to you?"

---

[1] Ayman Al-Zawahiri, a physician-turned-terrorist, succeeded Osama Bin Laden as the leader of al-Qaida.

75.     Dr. El-Ghazaly reported Defendant Fitzgerald's bigoted statements to Dr. Kim, the Program Director, in writing, on October 29, 2023, and provided Joanne Kim's contact information so that Dr. Kim could confirm that the assault and battery had occurred. Dr. El-Ghazaly's assault and battery complaint.

76.     Dr. Kim, visibly irritated, responded by telling Dr. El-Ghazaly that he was "forced" to forward his complaint for further investigation because it was sent in writing.

77.     To be sure that Dr. El-Ghazaly got the message that Dr. Kim had every intention of ignoring his "complaint," on the weekend of December 8–9, 2023, Dr. Kim scheduled Dr. El-Ghazaly to be on call with Dr. Fitzgerald—deliberately putting him back under the control of the same doctor who had assaulted and harassed him, despite Dr. El-Ghazaly having expressed relief at being away from Dr. Fitzgerald during a two-month external rotation

78.     Dr. Fitzgerald then immediately manufactured a false allegation during that call, claiming Dr. El-Ghazaly missed an emergency case.

79.     Dr. Fitzgerald falsely accused Dr. El-Ghazaly of "missing an acute abdomen" in a patient who presented to emergency with poor urinary output. Acute abdomen is a surgical diagnosis that emergency attendings are trained to detect and consult general surgery for.

80.     In this case, the attending did not feel the need to call general surgery for the patient upon his presentation with poor urinary output.

81.     Despite the attending's failure to respond, Dr. El-Ghazaly – who was on home call-- arrived at the patient's bedside within 30 minutes. His swift and decisive actions, including personally wheeling the patient to the Ct scanner to expedite diagnosis, were praised by senior urology resident Dr. Lu and the emergency resident Dr. Maguire.

82.     Because of the completely false narrative that Dr. Fitzgerald was attempting to create about him, Dr. El-Ghazaly sent Dr. Kim an email the following day expressing his concerns, emphasizing that Dr. Fitzgerald was intentionally trying to cause him professional harm.

83.     Tellingly, upon learning of the events, Dr. Kim privately admitted to Dr. Lu during a phone call: "Tarek did a good job." He also privately told Dr. Lu, "It doesn't sound like Tarek to delay. I bet he drove right in once they called him." See **Exhibit E**.

84.     Dr. Kim's sole focus was on retaliating against Dr. El-Ghazaly.  On December 11, 2023, he called Dr. El-Ghazaly and warned him never to send another written complaint, saying,

***"He is the attending and you are the resident. You are never going to win this."***

85.     Dr. Kim took no corrective action whatsoever against Dr. Fitzgearld for making a false accusation against Dr. El-Ghazaly, but rather, he used the false allegation to submit a written warning in February 2024 to Dr. El-Ghazaly that he later used to pretext his termination.

### *Undeniable Clinical Excellence and Growing Retaliation*

86.     Following his complaint against Dr. Fitzgerald, during November and December 2023, Dr. El-Ghazaly completed a two-month external rotation at Good Samaritan Hospital.

87.     He received unanimous "Exceeds Expectations" marks from the chairman of the rotation, who had solicited feedback from all six Dr. El-Ghazaly had worked with during the rotation. See **Exhibit F.**

88.     Chair Dr. Loizdes praised him as professional, diligent, and highly competent. Dr. Kukadia a private attending at the Good Samaritan rotation also had positive things to say about Dr. El-Ghazaly's performance and professionalism, writing: *"I was always impressed that he arrived to each case well prepared. He knew everything about the patient, summarizing the details, imaging reports, etc. He took over the care from start to finish, rarely did I have to intervene. He*

*was eager to see patient consults and assist with problems on the floor. I had complete confidence that my private patients were in good hands. Furthermore he communicated well with nursing staff and fellow physicians. He was personable, good natured and professional. I enjoyed good rapport with him and even invited him to come back on Fridays to do my cases after his rotation ended. I had absolutely no misgivings about his character or competence.*" Dr. Kukadia's review is attached hereto as **Exhibit F**.

### *Cover-Ups and Institutional Gaslighting*

89.     Yet despite the repeated praise Dr. El-Ghazaly received, in early January 2024, Dr. Kim told senior residents to prepare to have Dr. El-Ghazaly repeat his PGY3 year and encouraged them to gather negative evidence against him to justify this decision. At this point, Dr. El-Ghazaly was just two months into his PGY-3 year, during which he received "Exceeds Expectations" evaluations across the boards for his performance as a PGY3.

90.     On January 12, Dr. El-Ghazaly promptly responded to a 4:12 a.m. page concerning Dr. Waltzer's patient. Dr. Waltzer and Dr. Huang later falsely accused him of ignoring it for hours.

91.     Dr. Huang contacted Dr. El-Ghazaly in the morning and told him that Dr. Waltzer had been falsely informed by a resident that Dr. El-Ghazaly was paged for the patient at midnight and refused to see the patient, then waited four hours before seeing him.

92.     Dr. El-Ghazaly responded by showing Dr. Huang the timing of his page and the timing of his note, which proved he had received the page shortly after 4:00am. S**ee Exhibit G**

93.     Despite this Dr. Huang told Dr. El-Ghazaly not to tell Dr. Waltzer what really happened, and admitted that she didn't tell the leadership the truth about the incident. See **Exhibit G**.

### *Defendant Kim's Bias is Made Explicit*

94.     On January 13, 2024, Dr. El-Ghazaly emailed Dr. Kim expressing concerns that the general surgery chief resident was spreading fabricated information about him directly to the chairman and explained the situation to him. See **Exhibit H**.

95.     Dr. Kim responded on January 14, 2024, by texting Dr. El-Ghazaly requesting a meeting to discuss his progress.

96.     During the meeting Dr. Kim acknowledged that Good Samaritan "loved" Dr. El-Ghazaly.

97.     Nonetheless, Dr. Kim said he is highly likely to repeat the PGY3 year based on his performance.

98.     Dr. Kim admitted other residents had performed much worse on the in-service exam and were not punished.

99.     Dr. Kim then exposed his discriminatory mindset, telling El-Ghazaly there was a "cultural thing" about how he speaks.

100.     After the meeting, Dr. Huang told Dr. El-Ghazaly that if he had not sent Dr. Kim another complaint, Dr. Kim would not have arranged the meeting.

### *Weaponized Discipline to Silence a Whistleblower*

101.     On February 12, 2024, Dr. Kim delivered a Letter of Warning to Dr. El-Ghazaly. [**Exhibit I**]

102.     Shockingly, one of the primary written justifications for the issuance of the Letter of Warning was El-Ghazaly's written complaints.

103.     It included numerous falsehoods and misleading quotes—contradicted by medical charts, corroborating statements, and real-time praise from attendings.

104.    For example, it falsely accused him of abandoning a surgical patient who was not even under urology's care.

105.    It also cited an anesthesiologist's vague comment about "resistance" despite El-Ghazaly's strict adherence to protocol as detailed later by his senior resident, who approved all his orders beforehand, then admitted she 'got into trouble' with Dr. Kim when she defended Dr. El-Ghazaly, revealing his coercion of residents to submit complaints against Dr. El-Ghazaly. See **Exhibit J**.

106.    In addition to citing Dr. El-Ghazaly's submission of written complaints as a reason for its issuance, Dr. Kim's Letter of Warning came with a verbal warning to never send any more written complaints, and threats to Dr. El-Ghazaly that "these complaints will sink you, and will be your downfall in this program."

### *Universal Praise from Surgeons and Attendings*

107.    The Letter of Warning also indicated a need for daily briefings by Dr. El-Ghazaly's attending physicians after surgical procedures. This ultimately backfired because his evaluations were uniformly positive.

108.    Between February and April 2024, numerous attending physicians—including Drs. Davis, Schulsinger, Weissbart, Berg, Sheynkin, Spaliviero, Churukanti, and Darras—offered written and verbal praise to Dr. El-Ghazaly for excellent performance, professionalism, and surgical skill. See **Exhibit K**.

109.    Even Dr. Kim acknowledged his surgical preparedness—then again dismissed his success as a "cultural issue." See **Exhibit L (excerpts of this recording)**.

110.    On February 25, 2024, Dr. Lu, the PGY4 resident who had just finished being on a thirty-six-hour call with Dr. El-Ghazaly, called to tell him that he did a great job as the junior

resident on call and that it would be a shame to have to repeat the year after the great job he's done. She told Dr. El-Ghazaly about Dr. Kim's meeting with the senior residents. She told him that a PGY3 spot had opened up in Boston, at Harvard Beth Israel Deaconess Medical Center ("Harvard-BIDMC") and urged him to apply for the position and transfer there to escape Dr. Kim's retaliation.

111.    Dr. El-Ghazaly applied for the position and was invited for multiple interviews supported by positive feedback relayed by the assistant program director, Dr. William Berg, as well as written assurances by the Chair, Dr. Waltzer, to support his application for the PGY3 spot at Harvard-BIDMC. They ultimately chose an applicant from a more prestigious institution for the position.

### *Negligence and Favoritism Run Rampant*

112.    While Dr. El-Ghazaly faced punishment for speaking up, favored residents under Dr. Kim's protection committed horrific errors: allowing cancer to spread, lying about care, and causing preventable deaths.

113.    By way of example, in or around February 2024, Dr. El-Ghazaly had noticed Chief Resident Dr. Huang's poor preparation for partial nephrectomy procedures, and texted her images and a summary of a patient's abnormal anatomy leading to a triple blood supply to the right kidney that would need to be addressed during the scheduled procedure to avoid catastrophic complications. Dr. Huang, and later, Dr. Waltzer, ignored Dr. El-Ghazaly's warning before and during the procedure, leading to the tumor being very well-perfused during the dissection, leading to the cystic component of the tumor rupturing all over the patient's abdomen as they carried out resection amid profuse bleeding that obscured the safe resection margin. Such a complication is associated with a 10-fold higher recurrence of cancer after surgery. See **Exhibit M**.

114.    Dr. El-Ghazaly reported this incident of negligence to Dr. Waltzer in an email on March 29, 2024. Dr. Huang did not face any disciplinary action for the catastrophic complications suffered by the patient, despite being warned of the abnormal anatomy beforehand. Instead, Dr. El-Ghazaly was later penalized for making his report, as evidenced by the fact that his criticism was cited in the termination letter.

115.    In another example of favoritism impacting patient care at this program, Dr. Huang recalled to Dr. El-Ghazaly how she mistakenly performed the wrong bedside procedure for the wrong patient without verifying his identity, and without confirming the procedure with her senior physicians, leading to multiple complications for the patient, who had to undergo invasive procedures and prolonged hospitalization as a result of these mistakes. Dr. Huang did not face any consequences by Dr. Kim for such negligent malpractice. Dr. El-Ghazaly reported this incident to the SBUH Graduate Medical Education office on April 8, 2024.

116.    On March 8, 2024, Dr. El-Ghazaly was assigned to assist the Chief Resident, Dr. Chris Du, and Dr. Waltzer with a laparoscopic radical nephrectomy. After the ports were placed, Dr. Waltzer left the room to provide the Chief Resident with an opportunity to start the dissection on his own. Dr. El-Ghazaly was tasked with holding the camera for the Chief Resident.

117.    While the Chief Resident was taking the bowel down over the upper pole of the kidney, Dr. El-Ghazaly noticed the spleen was very closely and tightly tethered to the upper pole of the kidney, placing it at risk of splenic hilar avulsion with aggressive manipulation of the kidney, especially during a hand-assisted procedure. Dr. El-Ghazaly advised the Chief Resident to release the closely tethered spleen to avoid injury to the splenic hilum while the kidney is being pulled on. The Chief Resident declined Dr. El-Ghazaly's advice, saying he would rather make some progress on the kidney and hilar dissection before Dr. Waltzer returned to the room.

118.    Dr. El-Ghazaly had warned his seniors multiple times in the past about the abandonment of safe technique during the laparoscopic and robotic dissection of the renal hilum by Dr. Waltzer. The patient ended up dying from uncontrolled bleeding due to a suspected splenic hilar injury, and the general surgery team was called in too late to perform the splenectomy. The patient received at least 19 units of blood before succumbing to the injuries she sustained during Dr. Waltzer's procedure.

119.    Concerned with the recurrence of these catastrophic complications at SBUH, Dr. El-Ghazaly communicated his concerns about poor preparation before renal surgery, as well as the abandonment of safe technique during renal procedures in an email to the chairman, Dr. Waltzer, on March 29, 2024, and detailed techniques he had learned during his advanced laparoscopic and robotic fellowship training at Northwestern, where no such complications routinely witnessed at SBUH had occurred. See **Exhibit N**.

120.    Despite this tragic and preventable death of a patient, neither Dr. Waltzer, nor any of Dr. Kim's favored residents faced any disciplinary action.

### *Retaliatory Erasure and Termination*

121.    On or around March 15, 2024, Dr. Kim called Dr. El-Ghazaly, telling him, falsely, that his allegations against Dr. Fitzgerald were investigated and found to be unsubstantiated and wondering if he had been lying about what happened.

122.    Unbeknownst to Dr. Kim, Dr. El-Ghazaly had already directly received a letter from the Office of Equity informing him of the true result of the investigation: that the allegations were all found to be substantiated. (**Ex. D**). Dr. Kim ended the phone call by reiterating his intention to arrest Dr. El-Ghazaly's PGY progress allegedly based on his performance. (Excerpts of a recording of this conversation is attached as **Exhibit O**).

123.    In or around March 2024, Dr. Kim posted a series of fake negative evaluations for Dr. El-Ghazaly for procedures he done with him, that he had also previously done with Dr. Steven Weissbart, who had no concerns and was very happy with Dr. El-Ghazaly's performance during the same procedures.

124.    Throughout March and April, 2024, Dr. Kim temporarily blocked Dr. El-Ghazaly from completing the ACGME survey by having his office led by Ms. Dempsey submit false email credentials to the ACGME. See **Exhibit P**.

125.    On March 16, 2024, Dr. El-Ghazaly sent an email to Dr. Waltzer, communicating his concerns about retaliatory actions and fabrications by Dr. Kim, a breach of confidentiality by Dr. Kim regarding a trainee's medical condition, as well as detailing surgical negligence by Dr. Michael Ernst that had led to the loss of a child's kidney.  See **Exhibit Q**.

126.    Facing inaction by the chairman, on April 8th, 2024, Dr. El-Ghazaly sent an email to the graduate medical education office with concerns about a dangerous situation at SBUH, retaliatory action and affinity bias by Dr. Jason Kim, the program director at the time, and detailing how Dr. Kim knowingly allowed for an unqualified Dr. Fierro to independently supervise residents despite her lack of urology training. See **Exhibit R**.

127.    On April 17, 2024, based on Defendants' knowingly false, misleading and dishonest claims, Dr. El-Ghazaly was fired.

128.    The termination letter cited fabricated and uninvestigated allegations, and even criticized him for "questioning Dr. Waltzer's technique and approach to surgery"—after the surgeries that ended in tumor rupture and the patient's death.

### *A Doctor Who Spoke the Truth—and Paid the Price*

129.    Dr. El-Ghazaly exemplified what the medical profession claims to value: courage, integrity, patient advocacy, and the moral backbone to speak up when others stayed silent.

130.    For daring to report racist hate speech, incompetence, and abuse, Dr. El-Ghazaly was isolated, retaliated against, and ultimately terminated.

### FIRST COUNT
**(*Race and National Origin Discrimination in Violation of 42 U.S.C. § 1981, et seq.*)**

131.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

132.    Drs. Kim and Fitzgerald harassed and discriminated against Dr. El-Ghazaly with respect to his compensation, terms, conditions, or privileges of employment, because of Dr. El-Ghazaly's race and/or national origin.

133.    More specifically, by way of illustration, Dr. Kim subjected Dr. El-Ghazaly to a pattern of harassment including, but not limited to, allowing his supervisor, Dr. Fitzgerald, to subject Dr. El-Ghazaly to harassing comments, including calling him inbred on multiple occasions, dehumanizing comments about Egyptian physicians, and referring to a group related to him as a people who "don't shower" and "should have been bombed", as well as assigning Dr. El-Ghazaly to work with Dr. Fitzgerald after the latter had assaulted him in the operating room.

134.    Dr. El-Ghazaly was further subjected to adverse actions, including but not limited to, a harassing and hostile work environment, unwarranted reprimands, and the termination of his employment, in a discriminatory manner because of his race and/or national origin.

135.    Defendants acted with malice and/or with reckless indifference to Dr. El-Ghazaly's federally protected rights.

136.    As a direct and proximate result of Defendants' violations of Section 1981, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

137.    Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

## SECOND COUNT
### (*Race and National Origin Discrimination in Violation of*
*New York State Human Rights Law, Executive Article 15, Section 296*)

138.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

139.    Dr. El-Ghazaly is Egyptian in terms of his race and national origin.

140.    Defendants both individually and collectively harassed and discriminated against Dr. El-Ghazaly with respect to his compensation, terms, conditions, or privileges of employment because of Dr. El-Ghazaly's race and national origin.

141.    More specifically, by way of illustration, Defendants subjected Dr. El-Ghazaly to a pattern of harassment including, but not limited to, allowing his supervisor, Dr. Fitzgerald, to subject Dr. El-Ghazaly to racially offensive comments, including calling him "inbred" on multiple occasions, and dehumanizing comments about Egyptian physicians and Arabs.

142.    Dr. El Ghazaly was further subjected to adverse actions, including but not limited to, a harassing and hostile work environment, unwarranted reprimands, and the termination of his employment, in a discriminatory manner because of his race and/or national origin.

143.    Defendants acted with malice and/or with reckless indifference to Dr. El-Ghazaly's state protected rights.

144.    As a direct and proximate result of Defendants' violations of the NYSHRL, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, other monetary harms, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

145.    Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

## THIRD COUNT
### (Retaliation in Violation of 42 U.S.C. § 1981, et seq.)

146.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

147.    Dr. El-Ghazaly engaged in protected activity under Section 1981, including, but not limited to, by expressing concerns regarding, and otherwise opposing, the harassment and discrimination he was subjected to based on his race and national origin.

148.    The Defendants unlawfully coerced, intimidated, threatened, and/or interfered with Dr. El-Ghazaly's exercise of or enjoyment of rights granted by Section 1981.

149.    More specifically, the Defendants discriminated and/or retaliated against Dr. El-Ghazaly for engaging in activity protected under Section 1981, including, but not limited to, by allowing employees, including his supervisor Dr. Fitzgerald, to subject Dr. El-Ghazaly to harassing comments, including calling him an inbred on multiple occasions, and dehumanizing comments about Egyptian physicians and Arabs.

150.    Dr. El-Ghazaly was further subjected to adverse action, including, but not limited to, a hostile work environment, unwarranted reprimands, and the termination of his employment, in a retaliatory manner for engaging in protected activity under Section 1981.

151.    The Defendants acted with malice and/or with reckless indifference to the federally protected rights of Dr. El-Ghazaly.

152.    As a direct and proximate result of the Defendants' violations of Section 1981, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

153.    Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

### FOURTH COUNT
#### (*Retaliation for Engaging in Protected Activity in Violation of New York State Human Rights Law, Executive Article 15, Section 296*)

154.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

155.    Dr. El-Ghazaly engaged in protected activities under the NYSHRL including, but not limited to, by expressing concerns regarding, and otherwise opposing, the harassment and discrimination he was subjected to based on his race and national origin.

156.    Defendants unlawfully coerced, intimidated, threatened, and/or interfered with Dr. El-Ghazaly's exercising of or enjoyment of rights granted by the NYSHRL.

157.    More specifically, the Defendants discriminated and/or retaliated against Dr. El-Ghazaly for engaging in activity protected under the NYSHRL, including but not limited to, by allowing employees, including his supervisor Dr. Fitzgerald, to subject Dr. El-Ghazaly to harassing comments, including calling him inbred on multiple occasions, and dehumanizing comments about Egyptian physicians and Arabs.

158.    Dr. El-Ghazaly was further subjected to adverse actions, including, but not limited to, a hostile work environment, unwarranted reprimands, and the termination of his employment, in a retaliatory manner for engaging in protected activity under the NYSHRL.

159.    The Defendants' actions were wanton, malicious, and/or oppressive.

160.    The Defendants acted willfully and/or with reckless disregard for the protected rights of Dr. El-Ghazaly.

161.    As a direct and proximate result of the Defendants' violation of the NYSHRL, Dr. El-Ghazaly has suffered and continues to suffer damages, including, but not limited to, lost

compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

162.    Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skill, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and costs.

### FIFTH COUNT
*(Retaliation for Whistleblowing under New York Labor Law §§ 740-741)*

163.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

164.    Dr. El-Ghazaly disclosed to supervisors and SBUH leadership practices of SBUH that he in good faith, reasonably believes constitutes improper quality of patient care and professional misconduct.

165.    For example, Dr. El-Ghazaly reported a hospitalist misrepresenting herself as a Urology attending physician to other doctors and patients, unsafe surgical practices, and inadequate supervision contributing to patient harm.

166.    Defendants took adverse action against Dr. El-Ghazaly, including but not limited to, fabricating negative evaluations and terminating his employment because he engaged in protected whistleblowing activity.

167.    Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, an injunction to restrain continued unlawful retaliation, reinstatement to the same position he

held before the retaliatory action or front pay in lieu thereof; reinstatement of full fringe benefits and seniority rights; compensation for lost wages, benefits, and other remuneration (including, but not limited to, back pay and front pay); a civil penalty of an amount not to exceed ten thousand dollars; punitive damages; attorneys' fees; interest; and costs.

## SIXTH COUNT
### (*"Stigma Plus"* Claim Under 42 U.S.C. § 1983)

168.    Plaintiff realleges and incorporates each and every allegation set forth above and below as if fully set forth and restated herein.

169.    Each of the individually named Defendants was and is employed by the State of New York and is therefore a "state actor" for purposes of 42 U.S.C. § 1983.

170.    As detailed above, Defendants made materially false, misleading and dishonest statements about Plaintiff regarding his allegedly improper conduct and the grounds for his termination from the SBUH program.

171.    Defendants made these statements to various third parties, including but not limited to, multiple high-level executives and decisionmakers at SBUH.

172.    As a result of Defendants' false and misleading statements to these third parties, Dr. El-Ghazaly was expelled from the SBUH medical program.

173.    As a result of Defendants' false and misleading statements, Dr. El-Ghazaly has suffered severe, permanent, and irreparable damage to his reputation.

174.    As a result of false and misleading statements made to third parties, Dr. El-Ghazaly has been blacklisted from medical programs throughout the United States, and his career as a urologist has been permanently destroyed.

175.     Dr. El-Ghazaly has been deprived of procedural due process and has not been afforded notice and an opportunity to be heard in a name-clearing hearing.

176.     The damage to Dr. El-Ghazaly's career was in addition to, and temporarily proximate to, the stigma generated by Defendants' false and misleading accusations.

177.     As a result of Defendants' defamatory statements to third parties, Dr. El-Ghazaly was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial legal expenses, had his personal and professional reputation destroyed, lost his Stony Brook University Hospital, and lost his livelihood as a medical doctor.

178.     Dr. El-Ghazaly seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, loss of surgical skills, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

**WHEREFORE**, Plaintiff, Tarek El-Ghazaly, M.D., respectfully asks this Court to enter preliminary and final orders and judgments as necessary to provide Plaintiff the following requested relief:

A.     Schedule this matter for trial by jury;

B.     Find the Defendants liable on all counts;

C.     Award the Plaintiff his lost compensation and benefits (including, but not limited to, back pay and front pay);

D.     Award the Plaintiff other monetary damages, including damages for his diminished earning capacity and injury to reputation, loss of surgical skills;

E.     Award the Plaintiff damages for his emotional pain, mental anguish, loss of enjoyment of life, suffering, and other emotional distress damages;

F.      Award the Plaintiff compensatory damages, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

G.      Award the Plaintiff punitive damages;

H.      Award the Plaintiff his reasonable attorney's fees;

I.      Award the Plaintiff interest and costs;

J.      Award the Plaintiff all other damages to which he is entitled; and

K.      Grant such further relief as is just and equitable.

Dated: New York, New York
       July 16, 2025

Respectfully submitted,

**JOSEPH & NORINSBERG, LLC**

Jon L. Norinsberg, Esq.
Bennitta L. Joseph, Esq.
*Attorneys for Plaintiff*
825 Third Ave., Suite 2100
New York, New York 10022
Tel. No.: (212) 227-5700
Fax No.: (212) 656-1889
jon@employeejustice.com
bennitta@employeejustice.com