UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
TAREK EL-GHAZALY, M.D.,                                     :
                                                            :
                        Plaintiff,                          :   **MEMORANDUM DECISION AND**
                                                            :   **ORDER**
            - against -                                     :
                                                            :   25-cv-3939 (BMC)
JASON KIM, M.D., WAYNE WALTZER,                             :
M.D., JOHN FITZGERALD, M.D., LORA                           :
DEMPSEY, and ZHENYUE HUANG, M.D.,                           :
                                                            :
                        Defendants.                         :
----------------------------------------------------------- X

**COGAN**, District Judge.

A few months into plaintiff's urology residency at Stony Brook University Hospital ("SBUH"), the attending physician began making distasteful comments to him about Egyptians and Arabs. Plaintiff, who is Egyptian, eventually lodged a discrimination complaint with SBUH's Office of Equity and to the urology program director. Roughly six months after that, plaintiff was terminated. Plaintiff now brings discrimination and retaliation claims pursuant to 42 U.S.C. § 1983 and the New York State Human Rights Law ("NYSHRL"). Plaintiff also brings a § 1983 "stigma-plus" claim based on stigmatizing statements that defendants made during his termination, which plaintiff says caused his prospective employer to rescind its offer.

Defendants have moved to dismiss the complaint in its entirety: Drs. Jason Kim, Wayne Waltzer, and Zhenyue Huang together, as the "Current SUNY Defendants," and Dr. John Fitzgerald separately.[1] As discussed below, Huang is dismissed from this action for insufficient

---

[1] Lora Dempsey was previously named as a defendant in this case and also moved to dismiss the complaint in its entirety. Because she has since been terminated from this action, her motion is denied as moot.

service of process; all claims against Fitzgerald are dismissed; the discrimination and stigma-plus claims against Waltzer are dismissed; and the discrimination claims against Kim are dismissed. Plaintiff's retaliation claims against Waltzer and Kim and stigma-plus claim against Kim survive.

## SUMMARY OF AMENDED COMPLAINT

Plaintiff Tarek El-Ghazaly, M.D., is an Egyptian and Canadian national who received his medical education and training in the United States. On November 1, 2022, plaintiff was recruited as a second-year urology resident at SBUH. During plaintiff's residency, defendant Kim was the program director, defendant Waltzer was the chair, defendant Fitzgerald was an attending physician, and defendant Huang was a senior resident/fellow. The former three had authority over plaintiff's responsibilities, performance evaluations, and employment.

Plaintiff recounts multiple instances where Fitzgerald made distasteful remarks about Egyptians and Arabs during plaintiff's rotation at the Northport VA Medical Center ("VAMC"). In March 2023, Fitzgerald asked plaintiff whether he was Egyptian and whether he knew "that Egyptians would inter-breed." Seven months later, in October 2023, Fitzgerald told plaintiff during a procedure that "they don't use numbing gel" in Egypt because "[t]hey believe the patient should be punished for having a problem." The same day, Fitzgerald also said, "Arabs don't shower," and "we should have bombed them after 9/11." Although the described incidents happened seven months apart, plaintiff alleges that Fitzgerald made other such remarks about Egyptians in the months between.

Plaintiff had other issues with Fitzgerald during this time. He disagreed with the way Fitzgerald approached medical procedures, sometimes voicing his concerns to chief residents and even Fitzgerald himself. He also disagreed with Fitzgerald's support for the hiring of Dr.

2

Allegra Fierro as a urology attending because Fierro had no training in urology. Believing that Fierro's incompetence was harming patients, plaintiff eventually sent a letter to his chief residents titled "Litigation Risk to VA Residents," which detailed "egregious patterns of medical misconduct" by Fierro. Fitzgerald came to Fierro's defense, maintaining that she was a qualified urology attending. In August 2023, Fierro resigned.

Following Fierro's resignation, Fitzgerald told plaintiff that he knew that plaintiff had met with Kim about the Fierro letter and warned, "You understand that whatever I tell [Kim] at the end of your rotation will determine your future." He also told plaintiff that he thought plaintiff's age and experience "ha[d] been a problem," and that plaintiff "should be demoted."

On September 29, 2023, Fitzgerald and plaintiff were in the operating room performing a procedure together. While plaintiff was suturing an incision, Fitzgerald complained that plaintiff wasn't holding the needle holder properly. Fitzgerald then used forceps to pinch and twist plaintiff's finger to the correct angle, hurting plaintiff and ripping plaintiff's gloves in the process. Fitzgerald said that he did it to "teach him a lesson."

Plaintiff reported the surgery incident (which he characterized as an "assault and battery") and Fitzgerald's offensive remarks about Egyptians (which he characterized as "bigoted statements") to Kim on October 29, 2023, and to the Stony Brook Office of Equity ("Equity Office") on October 30, 2023. Kim told plaintiff that he was forced to forward his complaint for further investigation.

After that, plaintiff did a two-month external rotation at Good Samaritan Hospital from November through December 2023. Plaintiff appears to have worked with Fitzgerald only once during that time, when Kim scheduled them to be on call together for a weekend in December. During one of their procedures together, Fitzgerald accused plaintiff of missing an "emergency

3

case," an accusation which plaintiff maintains was false. The next day, plaintiff told Kim about his worry that Fitzgerald was trying to cause him professional harm. Kim warned plaintiff not to send any more written complaints, saying, "He is the attending and you are the resident. You are never going to win this." Although plaintiff finished his rotation at Good Samaritan with "Exceeds Expectations" marks, Kim told senior residents to prepare to have plaintiff repeat his third year.

On January 12, 2024, Waltzer and Huang accused plaintiff of ignoring a midnight page. The next day, plaintiff explained to Huang that he didn't receive the page until 4 AM and that he promptly responded at that time. Plaintiff then discovered that it was probably the general surgery chief resident who made the accusation against him, and informed Huang of the same. Huang told plaintiff not to go to Waltzer to explain the mistake, as it was "only going to make things worse," and assured him that Waltzer "really didn't care." However, when plaintiff asked Huang whether she told Waltzer what really happened, she said, "No."

Plaintiff thereafter emailed Kim to correct the record, expressing his concern that the general surgery chief resident was spreading false information about him. In response, Kim asked plaintiff to meet to discuss his progress. During that meeting, Kim told plaintiff that he would likely be repeating his third year based on his performance, even though other residents performed much worse on the in-service exam. He also told plaintiff that there was a "cultural thing" about the way he spoke.

On February 12, 2024, Kim sent plaintiff a "Letter of Warning." The letter, which plaintiff attached to the amended complaint, detailed several occurrences where "poor judgement was exercised," and listed concerns with plaintiff's medical knowledge, professionalism, and interpersonal and communication skills. The letter also mentioned plaintiff's complaints,

4

although it did not identify which complaints it encompassed (*i.e.*, medical malpractice versus discrimination):

> Continued insistence that one attending's negative opinion of you is affecting your overall evaluations, even though it has been explained multiple times that this is not the case. Multiple attendings and senior residents have expressed concerns about your performance. ... Continued insistence hat [*sic*] this counselling [*sic*] is retaliatory in nature due to the previous point. Sending inappropriately verbose emails about concerns or complaints. The emails are difficult to read and ineffective as a means of communication.

The letter then set out a plan for improvement and timeframe in which improvement had to be demonstrated. Finally, the letter concluded that if plaintiff continued to perform unsatisfactorily, he could be placed on probation or be subjected to other corrective action. According to plaintiff, the letter "included numerous falsehoods and misleading quotes." Kim also gave plaintiff a verbal warning to never send any more written complaints, threatening, "[T]hese complaints will sink you, and will be your downfall in this program."

Over the next several months, plaintiff received praise from numerous attending physicians regarding his performance, professionalism, and surgical skill. During this time, Kim acknowledged plaintiff's surgical preparedness but still noted a "cultural issue" with the way he came across to people. Meanwhile, plaintiff continued lodging complaints – against Huang, Waltzer, and other physicians for what he perceived as negligent conduct.

On March 15, 2024, Kim called plaintiff to tell him that the Equity Office investigated his allegations against Fitzgerald and found them to be unsubstantiated; he questioned whether plaintiff had been lying about what happened. Plaintiff, however, had already received an email from the Office of Equity a month prior telling him that his allegations against Fitzgerald had been substantiated. Kim reiterated his intention to stop plaintiff's residency progress based on his performance then ended the call.

Around this same time, Kim submitted "fake" negative evaluations for plaintiff. Kim also temporarily blocked plaintiff from completing the "ACGME survey" by having Dempsey submit false email credentials for plaintiff to the ACGME.[2]

On March 16, 2024, plaintiff sent a seven-page email to Waltzer and Dr. William Berg in which he "communicat[ed] his concerns about retaliatory actions and fabrications by Kim, a breach of confidentiality by Dr. Kim regarding a trainee's medical condition, [and] detail[ed] surgical negligence by Dr. Michael Ernst that had led to the loss of a child's kidney." Facing "inaction" (presumably, not receiving a reply), plaintiff sent a ten-page email to the Graduate Medical Education Office on April 8, 2024 "with concerns about a dangerous situation at SBUH, retaliatory action and affinity bias by Dr. Jason Kim, ... and detailing how Dr. Kim knowingly allowed for an unqualified Dr. Fierro to independently supervise residents despite her lack of urology training." Plaintiff was fired on April 17, 2024.

In April 2025, plaintiff secured a fellowship at the University of Virginia ("UVA"). Later that month, UVA rescinded its offer, citing "board ineligibility" at first, then "lack of transparency during the interview process." Plaintiff believes that Kim and SBUH staff communicated stigmatizing statements regarding his professional competence, ethics, and fitness to UVA's risk assessment/credentialing personnel. Plaintiff further believes that defendants have since provided adverse information to the Virginia Board of Medicine, hospital medical staff officers, background check companies, and credentialing bodies, effectively blacklisting him from medical programs throughout the United States.

---

[2] The ACGME appears to be the Accreditation Council for Graduation Medical Education

Plaintiff brings five causes of action against defendants in their individual capacities for racial discrimination and retaliation under § 1983 and the NYSHRL, and for violation of his procedural due process rights under § 1983 pursuant to the stigma-plus doctrine.

## DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), and to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[.]" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When deciding a motion to dismiss, the Court must "constru[e] the complaint liberally, accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." Elias v. Rolling Stone LLC, 872 F.3d 97, 104 (2d Cir. 2017) (quoting Chase Grp. All. LLC v. City of New York Dep't of Fin., 620 F.3d 146, 150 (2d Cir. 2010)).

Additionally, "[b]efore a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." Dynegy Midstream Servs. v. Trammochem, 451 F.3d 89, 94 (2d Cir. 2006) (quoting Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987)). "Therefore, to survive a motion to dismiss based on lack of personal jurisdiction and insufficient service of process, the plaintiff must demonstrate that []he adequately served the defendants." Buon v. Spindler, 65 F.4th 64, 73 (2d Cir. 2023).

### I. Service on Huang

The Current SUNY Defendants argue that this court lacks personal jurisdiction over Huang because plaintiff failed to properly serve her. Consistent with Huang's sworn declaration, the Current SUNY Defendants explain that plaintiff attempted to serve Huang by delivering the

summons and complaint to an employee of the Risk Management for University Faculty Practice Corporation ("UFPC"), even though Huang is not, and has never been, jointly employed by SUNY and UFPC and did not authorize anyone at UFPC to accept service on her behalf.

Plaintiff does not contest these facts. In fact, plaintiff makes no effort at all to demonstrate that he adequately served Huang. Instead, plaintiff argues that Huang "waived any technical objection to the form of service" by appearing through the Attorney General and seeking merits relief under Rule 12(b)(6). It is true that an objection to defective service can be waived "by submission through conduct," where the defendant had "actual knowledge of a suit coupled with extensive participation in pretrial proceedings." LPD New York, LLC v. Adidas Am., Inc., No. 15-cv-6360, 2021 WL 5139252, at *2-3 (E.D.N.Y. Nov. 4, 2021) (collecting cases). However, "[s]imply filing an appearance is insufficient to constitute waiver," Gore v. RBA Grp., Inc., No. 03-cv-9442, 2009 WL 884565, at *5 (S.D.N.Y. Mar. 27, 2009), particularly for a state employee who automatically receives state representation. In addition, there is no reason why a defendant cannot seek dismissal of an action for failure to state a claim and for insufficient service of process – that is, on alternative bases. Anyone who knows the phrase "assuming *arguendo*" understands that presenting a fallback argument does not concede the primary one. Huang is therefore dismissed for lack of personal jurisdiction due to insufficient service of process.

Even if service is a "fixable" issue (and even if that mattered), the Court would not extend plaintiff's time to serve Huang beyond the 90 days permitted by Rule 4(m) (it has been four months since the amended complaint was filed) because plaintiff has not and cannot show good cause for his failure to properly serve Huang. A "delay in service resulting from the mere inadvertence, neglect, or mistake of a litigant's attorney does not constitute good cause."

Oyewole v. Ora, 291 F. Supp. 3d 422, 430 (S.D.N.Y. 2018), aff'd, 776 F. App'x 42 (2d Cir. 2019) (quoting George v. Prof'l Disposables Int'l, Inc., 221 F. Supp. 3d 428, 433 (S.D.N.Y. 2016)). Huang first challenged service (albeit, of the original complaint) in August 2025 in the parties' joint letter for the initial status conference. But plaintiff did not then attempt to properly serve Huang. Huang challenged service again (now of the amended complaint) in her October 2025 motion to dismiss. Again, however, plaintiff did not attempt to properly serve Huang. Plaintiff has not shown good cause for his failure to serve Huang, and, on this record, it doesn't seem like he could.

## II.    Substitution of Fitzgerald Under the Westfall Act

For the first time on reply, Fitzgerald argues that plaintiff's allegations against him concern his employment with the federal government at the VAMC, so all causes of action against him "must be dismissed for lack of subject matter jurisdiction under [the] Westfall Act." "The Westfall Act, 28 U.S.C. § 2679, permits the United States, in certain circumstances, to be substituted as a party in a lawsuit against a federal employee alleging that the employee committed tortious conduct in the course of his employment." Carroll v. Trump, 148 F.4th 110, 114-15 (2d Cir. 2025). For actions initiated in federal court, the statute provides the following avenue for substitution:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

Id. (quoting 28 U.S.C. § 2679(d)(1)). Although substitution under § 2679(d)(1) is contingent upon certification by the Attorney General, § 2679(d)(3) permits an employee to, "[i]n the event that the Attorney General has refused to certify scope of office or employment under this section,

9

... petition the court to find and certify that the employee was acting within the scope of his office or employment." Id. (quoting 28 U.S.C. § 2679(d)(3)).

Setting aside the impropriety of Fitzgerald raising a new argument on reply, the Court denies Fitzgerald's request for Westfall substitution because the Attorney General has not provided certification – barring application of § 2679(d)(1) – and because the Attorney General has not refused certification – barring application of § 2679(d)(3). Fitzgerald says only that counsel is "in the process of requesting that the Department of Justice provide Westfall certification" and that the Court can make a judicial scope determination in the meantime. But the Westfall Act does not expressly permit the Court to substitute the federal government as a defendant without its consent or refusal, and Fitzgerald does not point to any caselaw saying otherwise. For these reasons, the Court declines to dismiss Fitzgerald on Westfall Act grounds.

### III. Discrimination Claims

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment." Patterson v. Cty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004). Section 1983, by contrast, "is not itself a source of substantive rights," but rather provides "'a method for vindicating federal rights elsewhere conferred,' such as those conferred by § 1981." Id. (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)). "[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state [actors]." See Duplan v. City of N.Y., 888 F.3d 612, 619, 621 (2d Cir. 2018) (emphasis omitted) (quoting Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989)). Appropriately, plaintiff locates his right to relief for defendants' § 1981 violations in § 1983. The Court thus analyzes plaintiff's federal discrimination claims under § 1983. See Gladwin v. Pozzi, 403 F. App'x 603,

605 (2d Cir. 2010); In re N.Y. City Dep't of Educ., No. 15-cv-7150, 2019 WL 1433163, at *5-6 (S.D.N.Y. Mar. 29, 2019) (construing the plaintiffs' § 1981 discrimination claims as causes of action brought under § 1983).

To maintain a § 1983 action, the conduct complained of must have (1) "been committed by a person acting under color of state law" and (2) "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994). Kim and Waltzer do not challenge their status as state actors and, as employees of a public institution, probably can't. See Jones v. Nickens, 961 F. Supp. 2d 475, 485-86 (E.D.N.Y. 2013) ("[SBUH] is a public institution. Accordingly, the Hospital and its employees are state actors for purposes of Section 1983."). Fitzgerald, on the other hand, challenges his state-actor status, arguing that plaintiff's allegations against him concern his federal employment at VAMC, not his separate state employment at SBUH. Plaintiff has alleged and Fitzgerald has admitted that Fitzgerald was a urology attending at SBUH during the relevant time period. That's enough to establish that Fitzgerald was acting under color of state law at the pleading stage. See id.

To satisfy the second factor at the pleadings stage, a plaintiff "must plausibly allege that (1) the [defendants] took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 87-88 (2d Cir. 2015). Plaintiff's allegations against Waltzer, Kim, and Fitzgerald miss the mark.

Plaintiff homes in on two allegations in support of plaintiff's discrimination claims against Waltzer: that Waltzer "failed to take protective action and allowed continued exposure to [Fitzgerald]," and that Waltzer received an email from plaintiff on March 16, 2024, before

11

plaintiff's termination which detailed plaintiff's concerns about "retaliatory actions and fabrications by Kim." These allegations don't get plaintiff anywhere. Among other reasons, neither allegation ties Waltzer's purported wrongful conduct to a discriminatory motivation.[3] Plaintiff does not plead, in even conclusory terms, that Waltzer took any action against him because of his race or national origin. Further, plaintiff does not plead facts supporting an inference that Waltzer's non-response to or "acquiescence" in others' purportedly discriminatory conduct was because of plaintiff's race or national origin. See Saunders v. New York Convention Ctr. Operating Corp., No. 20-cv-5805, 2022 WL 3577773, at *7 (S.D.N.Y. Aug. 19, 2022).

Although the 201-paragraph amended complaint is rife with accusations against Kim, nowhere does it allege, in non-conclusory terms, that plaintiff's race or national origin was a motivating factor in any adverse employment action that Kim took against him. See Durand v. Excelsior Care Grp. LLC, No. 19-cv-2810, 2020 WL 7246437, at *5 (E.D.N.Y. Dec. 9, 2020) ("Naked assertions of discrimination without any specific allegation of a causal link between the defendants' conduct and the plaintiff's membership in a protected class, are too conclusory to withstand a motion to dismiss." (cleaned up) (citation omitted)). The allegation that Kim once or twice referenced a "cultural thing" about the way plaintiff spoke is too ambiguous to color Kim's actions discriminatory. See Haynes v. Capital One Bank, No. 14-cv-6551, 2015 WL 2213726, at *2 (E.D.N.Y. May 8, 2015) (dismissing race discrimination claim where, "aside from one ambiguous remark made by her branch manager," the plaintiff "fail[ed] to allege any facts that

---

[3] The Court uses the phrase "wrongful conduct" as opposed to "adverse actions" because plaintiff does not allege that these incidents constitute adverse actions – and, in fact, they probably don't.

suggest[ed] her termination or any other adverse employment actions were connected to her race").[4]

Finally, with respect to Fitzgerald, "that [p]laintiff[] allege[s] a stew of discriminatory animus does not impart flavor to every disciplinary action taken against [p]laintiff[] and thereby transform those actions, even if unjustified, into discriminatory adverse employment actions." See Fukelman v. Delta Air Lines, Inc., No. 18-cv-00002, 2020 WL 2781662, at *3 (E.D.N.Y. May 29, 2020). Fitzgerald's offensive comments to plaintiff about Egyptians and Arabs could, theoretically, give Fitzgerald's actions against plaintiff a discriminatory "flavor."[5] But plaintiff rules out that possibility with his own allegations. Plaintiff alleges that Fitzgerald threatened him after he made his complaint about Fierro (that is, *because* of plaintiff's complaint about Fierro), and that Fitzgerald pointed to plaintiff's "age and experience" – not race or national origin – as a problem. And plaintiff alleges that Fitzgerald twisted his finger with forceps to "teach him a lesson," not to harm plaintiff because he is Egyptian. Finally, plaintiff alleges that Fitzgerald falsely accused plaintiff of missing an "emergency case" during a procedure in order to cause him professional harm, but he does not say that Fitzgerald had a discriminatory motive in doing so; and besides, "without sufficient facts, even the most sincerely held beliefs do not comprise a sufficient basis for withstanding a 12(b)(6) attack." Williams v. Wellness Med. Care, P.C., No. 11-cv-5566, 2013 WL 5420985, at *6 (S.D.N.Y. Sept. 27, 2013).

Fitzgerald's comments to plaintiff about Egyptians and Arabs were offensive. But under § 1983, that's not enough – even at the pleading stage. Plaintiff has to allege that his race or

---

[4] Absent any allegation of discriminatory animus, plaintiff's allegations that Kim "threatened" plaintiff about his written complaints and "falsely" told plaintiff that his allegations against Fitzgerald were unsubstantiated are irrelevant to the Court's analysis of the discrimination claims.

[5] For purposes of the analysis that follows, the Court assumes without deciding that Fitzgerald's alleged actions against plaintiff – the verbal warning, the forceps incident, and the accusation about missing an "emergency case" – were adverse actions.

13

national origin was a motivating factor behind some adverse action that Fitzgerald took against him. Plaintiff doesn't do that, so his § 1983 discrimination claim against Fitzgerald must fail.

Plaintiff's discrimination claims against Waltzer, Kim, and Fitzgerald fail also under the more lenient NYSHRL pleading standard which, under its most liberal formulation, requires only that a plaintiff allege that he has been "treated less well at least in part because of" his membership in a protected class. See Pullman v. Collins, No. 24-cv-1383, 2025 WL 2673807, at *14-15 (S.D.N.Y. Sept. 18, 2025). Plaintiff's allegations are insufficient to infer that he was treated less well because he is Egyptian.

## IV. Retaliation Claims

"[F]or a retaliation claim under § 1983 to survive ... a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against him, (3) because he complained of or otherwise opposed discrimination."[6] Vega, 801 F.3d at 91. "[F]or an adverse retaliatory action to be 'because' a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." Id. at 90. Under the "more lenient" NYSHRL pleading standard, a plaintiff can survive a motion to dismiss if he "show[s] that something happened that was reasonably likely to deter a person from engaging in protected activity." Moore v. Hadestown Broadway Ltd. Liab. Co., 722 F. Supp. 3d 229, 247 (S.D.N.Y. 2024) (citation omitted).

---

[6] Both parties evaluate plaintiff's federal retaliation claims under § 1981. However, as explained before with respect to plaintiff's federal discrimination claims, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state [actors]." See Duplan, 888 F.3d at 619, 621 (quoting Jett, 491 U.S. at 733). The Court thus analyzes plaintiff's federal retaliation claims under § 1983. See In re N.Y. City Dep't of Educ., 2019 WL 1433163, at *10 (construing the plaintiffs' § 1981 retaliation claims as causes of action brought under § 1983).

14

Plaintiff fails to plead retaliation claims against Fitzgerald. Plaintiff made his discrimination complaints to the Equity Office and Kim at the end of October 2023. The bulk of Fitzgerald's purported wrongful conduct towards plaintiff – the offensive comments, the forceps incident, the entire Fierro debacle – happened before plaintiff filed his complaints. Plaintiff points to only one negative incident with Fitzgerald after plaintiff filed his discrimination complaints: that Fitzgerald falsely accused him of missing an "emergency case" during a procedure. But there are no allegations in the amended complaint suggesting that Fitzgerald made this accusation because of plaintiff's protected activity, nor is it apparent to the Court how this trivial incident would deter a person from engaging in protected activity. And, as stated before with respect to plaintiff's discrimination claims, whether plaintiff believed that Fitzgerald was trying to cause him professional harm with this accusation is irrelevant. See Williams, 2013 WL 5420985, at *6.

Plaintiff's retaliation claims against Waltzer and Kim just barely survive. Kim received a discrimination complaint from plaintiff in October 2023, and both Kim and Waltzer learned about plaintiff's discrimination complaint to the Equity Office at least as early as March 2024.[7] Plaintiff was ultimately terminated in April 2024 with a letter that both Waltzer and Kim signed. Accordingly, plaintiff argues that he was terminated because of his discrimination complaints. With respect to Waltzer, the fact that the termination followed close in time to Waltzer learning about plaintiff's discrimination complaint to the Equity Office is just enough to plead but-for causation. See Gilbert v. Stony Brook Univ., No. 21-cv-2273, 2022 WL 409716, at *10 (E.D.N.Y. Feb. 10, 2022). By contrast, Kim received a discrimination complaint directly from plaintiff almost six months before the termination, which might be too great a gap. See

---

[7] At this stage, the Court is treating the October 29, 2023 complaint to Kim as protected activity because defendants have not argued otherwise.

15

Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir.2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship."). However, viewed in the context of plaintiff's other allegations against Kim – that he scheduled plaintiff to be on call with Fitzgerald for a weekend in December 2023 (less than two months after plaintiff's discrimination complaint); that he sought to arrest plaintiff's residency progress in December 2023 even though plaintiff was performing well during his external rotation; and that he mentioned plaintiff's "complaints" in the February 2024 Letter of Warning – it is at least plausible that Kim terminated plaintiff because of his discrimination complaints.

To be sure, the Court doesn't find plaintiff's story very convincing. Plaintiff has voluntarily provided the Court with several of the key documents in this case (e.g., plaintiff's rambling complaints to supervisors, the biting Letter of Warning and termination letter) and frankly, they don't look good for plaintiff. Rather, they make it seem like plaintiff was a difficult person with whom to get along. Even plaintiff's allegations suggest a number of potentially legitimate, non-retaliatory reasons for his termination. However, at the pleading stage, the Court cannot weigh the evidence. Plaintiff's § 1983 and NYSHRL retaliation claims against Waltzer and Kim survive defendants' motions to dismiss.

V. **Stigma-Plus Claim**

A stigma-plus claim "requires a plaintiff to allege (1) the utterance of a statement about h[im] that is injurious to h[is] reputation, that is capable of being proved false, and that he or []he claims is false, and (2) some tangible and material state-imposed burden ... in addition to the stigmatizing statement." Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005) (internal quotation marks

16

and citation omitted). "[T]he 'plus' imposed by the defendant must be a specific and adverse action clearly restricting the plaintiff's liberty." Id.

Here, plaintiff alleges that "SBU staff" and "Dr. Kim (and/or those acting with him) communicated stigmatizing statements regarding [p]laintiff's professional competence, ethics, and fitness to practice to UVA's Risk Assessment/Credentialing personnel," and that UVA rescinded his fellowship offer for "lack of transparency during the interview process, reflecting reliance on [d]efendants' stigmatizing publications." With respect to Kim, these allegations are sufficient at the pleading stage, just barely; with respect to Waltzer and Fitzgerald, they are not. Plaintiff cannot attribute personal involvement to Waltzer and Fitzgerald in the alternative (*i.e.*, "and/or those acting with [Kim]") without alleging any facts that would support such a scenario.

Defendants' only other argument against the stigma-plus claim is that plaintiff had an opportunity for an "Article 78 name-clearing proceeding" as a state employee. See Piccoli v. Yonkers Bd. of Educ., No. 08-cv-8344, 2009 WL 4794130, at *5 (S.D.N.Y. Dec. 11, 2009) (New York CPLR Article 78 "allows a dismissed municipal employee an avenue for challenging his termination as arbitrary and capricious and contrary to law." (citation omitted)). The availability of a post-termination name-clearing proceeding can defeat a stigma-plus claim. Segal v. City of New York, 459 F.3d 207, 212-14 (2d Cir. 2006); Piccoli, 2009 WL 4794130, at *5 (collecting cases). However, accepting plaintiff's allegations as true, a post-termination name-clearing proceeding was *not* available to him: he "requested name-clearing, but [d]efendants refused." The theoretical availability of such a hearing will not defeat his claim. Therefore, plaintiff's stigma-plus claim against Kim survives.

## CONCLUSION

For the foregoing reasons, Huang is dismissed from this action for insufficient service of process; all claims against Fitzgerald are dismissed; the discrimination and stigma-plus claims against Waltzer are dismissed; and the discrimination claims against Kim are dismissed. Plaintiff's retaliation claims against Waltzer and Kim and stigma-plus claim against Kim survive.

**SO ORDERED.**

                                                                           U.S.D.J.

Dated: Brooklyn, New York
       January 14, 2026